UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

DOUGLAS KNISKERN, as Personal
Representative of THE ESTATE OF ERIC
F. ROSS, and ARNSTEIN &
LEHR LLP, a limited liability partnership,

       Plaintiffs,

v.

DURKIN & DURKIN, LLP, a New Jersey
limited liability partnership, ELIZABETH MARY
DURKIN, ESQ., an individual, and ELIZABETH M.
DURKIN, as Personal Representative of THE
ESTATE OF THOMAS E. DURKIN, JR., Esq.,

       Defendants.

_____/

## COMPLAINT

Plaintiffs, DOUGLAS KNISKERN, as Personal Representative of the Estate of Eric F. Ross, and ARNSTEIN & LEHR LLP, by and through undersigned counsel, hereby sue Defendants, DURKIN & DURKIN, LLP, ELIZABETH MARY DURKIN, ESQ. and ELIZABETH M. DURKIN, as Personal Representative of The Estate of Thomas E. Durkin, Jr., Esq. (collectively "Defendants"), and allege as follows:

## PARTIES, VENUE AND JURISDICTION

1.     Plaintiff, Douglas Kniskern ("Mr. Kniskern"), is an attorney, a member of the Florida Bar for almost 40 years, a partner with the law firm of Arnstein & Lehr LLP, and a Florida resident, who was appointed as personal representative of the Estate of Eric F. Ross (the

"Estate"), probated in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (Case No. 502010CP004134XXXXSB).

2.      Plaintiff, Arnstein & Lehr LLP ("A&L"), is a limited liability partnership, engaged in the practice of law, with its principal place of business in Chicago, Illinois and several offices in Florida, including Broward County. A&L does not have an office in New Jersey, nor does A&L have any partners who are residents of the State of New Jersey.

3.      Defendant, Durkin & Durkin, LLP (the "Durkin Firm"), is a limited liability partnership, engaged in the practice of law, with its principal place of business in Essex County, New Jersey. The Durkin Firm was founded by the late Thomas E. Durkin, Jr., Esq., a former named partner of the firm. Durkin does not have an office in Florida, nor does Durkin have any partners who are residents of the State of Florida or the State of Illinois.

4.      Defendant, Elizabeth Mary Durkin, Esq. ("Liz Durkin"), the late Thomas E. Durkin, Jr., Esq.'s daughter, is an individual, believed to reside in Essex County, New Jersey, who was at all material times hereto an attorney and partner with the Durkin Firm that provided legal services to the Estate of Eric F. Ross.

5.      Defendant, Elizabeth M. Durkin, is an individual, appointed as Executor of the Estate of Thomas E. Durkin, Jr., Esq., being administered in New Jersey. At all times material hereto Thomas E. Durkin, Jr., Esq. ("Tom Durkin") was an attorney and partner with the Durkin Firm that provided legal services to the Estate of Eric F. Ross.

6.      This Court has "long-arm" jurisdiction over all of the Defendants pursuant to Fla. Stat. § 48.193, as all of them carried on business and provided legal services to the above-styled Estate within the jurisdiction, committed tortious acts within this jurisdiction or directed

wrongful acts to be committed into this jurisdiction, including, but not limited to, the submission of fraudulent invoices for legal services to be paid by the Estate.

7.     In addition, this Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties to this action and the amount in controversy exceeds $75,000, exclusive of interest, fees and costs.

8.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2).

9.     All conditions precedent to the maintenance of this action have been performed, satisfied waived, or have otherwise been excused.

## GENERAL ALLEGATIONS

10.     Eric F. Ross ("Mr. Ross") unexpectedly died at the age of ninety-one on September 8, 2010, in Zurich, Switzerland, as a result of an accident, leaving behind three adult children – Peter Ross ("Peter"), Michael Ross[1], and Barbara Bermann ("Barbara") – and a valuable testate estate of approximately $100,000,000.00.

11.     Mr. Ross was a Florida resident at the time of his death, but his Last Will and Testament (the "Will") was prepared by the Durkin Firm and Liz Durkin in New Jersey and the Will was witnessed and executed in New Jersey. Liz Durkin was not a member of the Florida Bar, and was not qualified to prepare a will for a Florida resident.

12.     Mr. Ross' Will named certain specific beneficiaries, but sought to transfer the bulk of the estate (approximately $80,000,000.00) to four charitable residuary beneficiaries; namely, the U.S. Holocaust Memorial Museum, Solomon Schechter Day School of Essex and Union (n/k/a Golda Och Academy), Saint Barnabas Medical Center Foundation, and American

---

[1] Michael Ross was estranged from Eric Ross and had no involvement of any kind in the actions which occurred as more particularly set forth herein.

Associates, and the Ben-Gurion University of the Negev (collectively the "Residuaries"). (A true and correct copy of Mr. Ross' Will is attached hereto as Exhibit "A").

13.     Mr. Ross, a Holocaust survivor and later, a highly successful businessman during his working years, had determined that philanthropy was his chief occupation in his later years. Mr. Ross expended considerable time and effort to ensure that his Estate was in order, that it would be administered in a manner such that its charitable purposes would be realized, and that the beneficiaries he so carefully selected would receive what he had, in fact, intended.

14.     Mr. Ross was aware that the selection of an appropriate representative to administer his Estate was crucial to both his charitable goals and his testamentary intent. Mr. Ross was also well-aware that the absence of a properly designated Estate representative could lead to chaos, including, *inter alia*, substantial litigation (and the related expense) over the appointment of a qualified personal representative.

15.     By all accounts, Mr. Ross' closest friend and confidante for more than 50 years was Tom Durkin and as a result, he wanted to entrust Tom Durkin with the responsibility of seeing that his Estate was properly administered according to his exacting testamentary requirements.

16.     Despite their relationship, the instant Will, which is the subject of this suit, was the first and only will that identified Tom Durkin to serve in the role as personal representative. Upon information and belief, the instant Will is the first and only will prepared by the Durkin Firm for Mr. Ross.

17.     Tom Durkin was never a probate attorney, but his daughter, Liz Durkin, claimed to have that expertise.

18.     The Will, which was drafted by Liz Durkin, provided for the appointment of her father Tom Durkin as personal representative, and in the event that Tom Durkin should predecease Mr. Ross, or was otherwise unqualified to serve, that Liz Durkin provided that she would be the successor to  serve.  Mr. Ross was not comfortable with Liz Durkin serving in any role in his Estate, but ultimately agreed to her possible appointment as a successor.

19.     At least three months before Mr. Ross' death, however, Liz Durkin learned by happenstance that under Florida law a personal representative must either be a Florida resident or a family member of the decedent. Neither Liz Durkin nor Tom Durkin satisfied either qualification requirement.

20.     As a consequence of her error, Liz Durkin prepared a will for a Florida resident under which she and her father were unqualified to serve as the personal representative, thereby frustrating the testamentary intent of Mr. Ross. Such conduct fell below the standard of care owed her client because, *inter alia*, were Mr. Ross to pass away before the error could be corrected, Mr. Ross' entire $100,000,000.00 Estate would be left in chaos pending the appointment (and related litigation) of a qualified personal representative as a result of various intra-family dynamics.

21.     But not only did Liz Durkin's conduct fall below the standard of care vis-à-vis her client, Mr. Ross, she also learned that her grievous error had the effect of denying herself and her father of what she believed would be a very substantial personal representative's fee.

22.     As a result, and in an extraordinary effort to recoup her desired personal representative fee, Liz Durkin initiated the first step in a long series of breaches of fiduciary duty, self-dealing, fraud, perjury, and intentional destruction of evidence, as are more particularly set forth herein.

112318505.1

### A.   The Codicil

23.    Recognizing that her efforts to install her father and herself as the personal representatives of Mr. Ross' Estate had failed, Liz Durkin concocted a scheme to insure that she would still be entitled to the *equivalent* of a personal representative fee.

24.    Rather than advising Mr. Ross to immediately appoint a qualified personal representative, by way of the execution of a simple Codicil or other instrument, Liz Durkin instead sought out the services of Mr. Kniskern to assist in the preparation of a Living Trust because under Florida law, the qualifications of a Personal Representative do not apply to a Trustee of a Florida Trust. Using a Living Trust, Tom Durkin could legally qualify as Trustee and therefore be compensated.  Mr. Kniskern had a prior working relationship with Liz Durkin and Mr. Ross as he previously served as local counsel for Mr. Ross who was the Personal Representative in a Florida probate proceeding the previous year when Mr. Ross's wife had passed away.

25.    Unbeknownst to Mr. Kniskern, Liz Durkin never advised Mr. Ross that Mr. Kniskern had been tasked with preparing a draft of a Living Trust.  And, Liz Durkin never advised Kniskern that Mr. Ross was unaware of Kniskern's involvement.  In fact, when Mr. Kniskern prepared a draft trust agreement for review by Mr. Ross, Liz Durkin removed all indications that the draft had been prepared by Mr. Kniskern's law firm, A&L, and then, in turn, presented the draft to Mr. Ross as if she had prepared it herself.

26.    Liz Durkin also never advised Mr. Ross that his testamentary intent had been frustrated and instead, kept her drafting error hidden from him rather than advising Mr. Ross to make immediate alternate plans in case he should pass away and leave his $100,000,000.00 Estate in chaos without a qualified personal representative.

27.     When Liz Durkin finally reviewed the proposed Living Trust with Mr. Ross, Mr. Ross correctly recognized that something was terribly wrong, but he couldn't get a candid explanation to his questions from the Durkin Firm. Rightfully, Mr. Ross became concerned and suspicious of Liz Durkin's motives.

28.     In fact, Mr. Ross had become so suspicious of Liz Durkin, that he wrote to his son-in-law, Dr. Pedro Bermann, and requested his assistance in understanding the Living Trust. Mr. Ross even mentioned in that correspondence to Dr. Bermann that after a review of the Living Trust he "got red in [his] eyes" and further stated that "there is no way that I will agree to many of the provisions." (*See* Letter from Mr. Ross to Pedro Bermann attached hereto as Exhibit "B").

29.     To this point in time, while Dr. Bermann had provided medical advice to Mr. Ross from time-to-time, Dr. Bermann had been entirely excluded from any and all discussions of Mr. Ross' assets or Estate Planning.  In fact, Mr. Ross had made it known to several people in his circle that he never would allow Dr. Bermann to have access to such information. Thus, the sudden outreach to Dr. Bermann and circumvention of Liz Durkin was all the more extraordinary, evidencing the significant level of distrust that developed.

30.     Dr. Bermann then retained the services of Leslie H. Zuckerman, Esq. ("Mr. Zuckerman") to review the draft Living Trust, which had been stripped of any indication of Mr. Kniskern's involvement.  Of great immediate concern to Mr. Ross, however, was that he was scheduled to leave for his annual vacation trip to Europe and was desperate to have the lack of a qualified personal representative issue resolved before he left.

31.     The thought that something could happen to him, which would leave his Estate, and more importantly, his charitable planning, at risk was consuming him.  In order to alleviate

his concerns, Mr. Zuckerman drafted a Codicil that provided for the appointment of Dr. Bermann to serve as his qualified personal representative.  The Codicil was sent to Mr. Ross in New Jersey on August 26, 2010, with instructions to sign and date it in the presence of three witnesses and a notary, have the witnesses sign it in his presence, have the notary affix his or her seal, and initial the bottom corner of each page.

32.     According to Dr. Bermann, Mr. Ross intended to destroy the Codicil on his return from Europe, but in the interim he could be at least confident and secure in knowing that if something should happen, all would be in order.

33.     The Codicil was sent to Mr. Ross at his house in New Jersey -- where he still spent a portion of his time after becoming a Florida resident -- who in turn, presented it to Liz Durkin for assistance in executing the Codicil.  However, Liz Durkin scoffed at it, and refused to assist in its execution because it provided for the appointment of someone other than herself or her father – Dr. Bermann.

34.     Having been rebuffed by the Durkin Firm, it appears that Mr. Ross went to a Chase Bank in West Orange, New Jersey and requested that "a document" be witnessed and notarized. The bank employees testified that they could confirm that Mr. Ross presented a document to them that required the signature of three witnesses, which is the same number of witness signature lines on the unsigned copy of the Codicil. At least one bank employee testified that Mr. Ross said that it was his "will."

35.     Mr. Ross called Dr. Bermann just before he left for Europe and left him a voicemail stating, in part:

> Hello Pedro, Eric calling. Need just to say that I'm very apprehensive and quite shaky facing this situation. [The Durkins] called me to be there by 12 o'clock, that means they want to have a friendly dinner first. I, of course, go along, firstly, with your

> proposal and everything that I should do and see if I get that paper
> -- that paper -- paper -- paper notarized that your attorney wants
> from me. Hopefully, of course, I survive this critical period of the
> next 30 days because this is not complete and totally different
> contents of some items.

36.     Dr. Bermann called Mr. Ross back and had a chance to speak with him just before he left for Europe, and Mr. Ross confirmed that he had arranged for the "the document" (meaning the Codicil) to be signed and, critically, saying that he had placed "the document" into a locked drawer in his office in his house in West Orange, New Jersey, and planned on destroying it upon his return from Europe.

37.     Unfortunately, catastrophe struck while in Zurich when Mr. Ross tripped, fell, and hit his head, tragically resulting in his death a few days later on September 8, 2010 (which was the day before Rosh Hashanah, the Jewish New Year).

38.     On September 11, 2010, immediately after the end of the Jewish holiday, Dr. Bermann and his wife, Barbara Bermann, travelled from Florida to Mr. Ross' West Orange, New Jersey house to secure the New Jersey house and to search for the Codicil, but could not locate the document where it was supposed to be – or anywhere else.

**B.     The Appointment of Douglas Kniskern as Personal Representative and His Retention of the Durkin Firm**

39.     In recognition of the fact that neither Tom Durkin nor Liz Durkin could qualify under Florida law to serve as personal representative of Mr. Ross' Estate, given that Peter Ross, Mr. Ross' son, could not qualify as personal representative as a result of a felony conviction, and given the circulating rumor of a possible Codicil that would have placed the Estate under the control of Dr. Bermann, the Durkins and Peter Ross, (give their respective distrust of Dr. Bermann) undertook expedited efforts to have Mr. Kniskern appointed as the personal representative of the Estate at the request of, and with the support of, the Residuary

Beneficiaries. At the time of Mr. Kniskern's appointment, he was completely unaware of the Durkins' self-dealing and scheming.

40.     On September 14, 2010, six days after Mr. Ross' death, Mr. Kniskern was duly appointed as the personal representative of the Estate of Eric F. Ross, and has continuously served in such capacity.

41.     After his appointment, Mr. Kniskern hired the Durkin Firm as the attorneys for the Estate to perform non-Florida legal work because of their close ties to Mr. Ross and their intimate knowledge of his financial and business affairs, charitable giving, and personal desires for the distribution of his estate. Mr. Kniskern's retention of the Durkin Firm occurred prior to him learning anything about the Durkins' self-dealing and scheming.

42.     Early on in the engagement, Liz Durkin and Mr. Kniskern discussed the issue of compensation and Mr. Kniskern explained to her how compensation of professionals employed by a personal representative is typically determined under Florida probate law.

43.     Despite Mr. Kniskern's explanation of Florida law, Liz Durkin advised him that she had something different in mind -- demanding that the Durkin Firm wanted a $2.5 million flat fee for the legal services to be rendered to the Estate.

44.     Mr. Kniskern explained to Liz Durkin that such an inflated fee award was "not going to fly" under Florida law, yet Liz Durkin insisted there was nothing to worry about since she and her father had friendly relationships with the Residuaries, who would ultimately be the ones footing the bill.

45.     Mr. Kniskern concluded the discussion by telling Liz Durkin that she would have to obtain the consent of the Residuaries in order to be paid the flat fee she and her law firm were

seeking and, if the Residuaries did not consent, then the Durkin Firm would have to prove up its fees in court.

### C.   The Codicil Litigation

46.     On November 5, 2010, Dr. Bermann filed an action seeking to establish the existence of the executed Codicil, under which he would have been appointed personal representative of Mr. Ross' Estate (the "Codicil Litigation").

47.     During the Codicil Litigation, Dr. Bermann asserted that "someone" had entered Mr. Ross' West Orange home in between his death on September 8, 2010, and Dr. Bermann's subsequent visit to the house on September 11, 2010, and "stole" the Codicil. Dr. Bermann eventually charged that it was Tom Durkin, the Estate's New Jersey lawyer, who had entered the home and "stole" the Codicil.

48.     Mr. Kniskern was understandably alarmed at the serious accusation that an attorney for the Estate would be charged with such unlawful conduct, and was also concerned that the Estate's lawyer had been identified as a material fact witness, causing him to question whether the Durkin Firm could continue to represent him at that time.

49.     The termination of the Durkin Firm as New Jersey counsel for the Estate would have all but eliminated the Durkin Firm's efforts to obtain the compensation that it sought, as counsel for the Estate, to replace the "lost" compensation from the failed effort to have themselves appointed as personal representative.

50.     Mr. Kniskern also recognized that, as the personal representative, he had an independent obligation to investigate the existence of the Codicil, and if found, to submit it to the probate court, even if it meant that Kniskern would also need to be replaced as personal representative in favor of Dr. Bermann.

112318505.1

51.     As part of his investigation, Mr. Kniskern discussed Dr. Bermann's accusation with Tom Durkin on at least two occasions, but Tom Durkin blatantly lied to his own client about being at Mr. Ross' New Jersey house during the relevant timeframe when the Codicil allegedly went missing.

52.     Eventually Dr. Bermann was unsuccessful in proving up the draft Codicil as being legally sufficient.

**D.  The Police Report**

53.     On February 17, 2011, Mr. Kniskern received through discovery from Dr. Bermann a South Orange New Jersey Police Report. The Police Report, dated September 27, 2010, stated:

> On Friday Sept. 10, 2010, Officer Chow and I responded to an activated house alarm at 206 Crestwood Dr. Upon arrival we were met at the door by a gentleman that presented himself as Mr. Durkin and related that the homeowner had just passed away overseas and he was his lawyer. Mr. Durkin had with him a key to the home as well as the alarm code, when properly used disabled the alarm. This satisfied us that the alarm was set off in error and both units returned to service. Mr. Durkin remained on scene

(A true and correct copy of the Police Report is attached as Exhibit "C").

54.     Faced with the reality that Tom Durkin was not only a material witness in the Codicil Litigation, but that he had also deliberately failed to disclose this material fact, and blatantly lied about it to his own client, Mr. Kniskern, it was concluded that the Durkin Firm could no longer represent him as personal representative of the Estate.

55.     As a result, on March 8, 2011, Mr. Kniskern had a conference call with both Tom and Liz Durkin, in which Mr. Kniskern advised them that their legal representation needed to be terminated.

112318505.1

56.     As a professional courtesy, Mr. Kniskern made a demand on the Durkin Firm, asking that the Durkin Firm resign so as to avoid the necessity of a formal and public termination.

57.     Liz Durkin admitted that she knew that she was being asked to resign by Mr. Kniskern as counsel for the Estate, but despite her client's request, unilaterally made the decision not to resign. The Durkin Firm never presented any legal authority to support its refusal to resign at the request of its Client

### E.   The Durkin Firm's Secret Efforts to Remove Kniskern and His Law Firm

58.     In retaliation for Mr. Kniskern's efforts to terminate the Durkin firm, Liz Durkin orchestrated a smear campaign along with Peter Ross to have Mr. Kniskern removed as personal representative, and A&L terminated as Florida counsel for the Estate.

59.     On or about March 24, 2011, Liz Durkin organized a conference call with her own legal counsel, Peter Ross, the Estate's accountant, and the Residuaries, the subject of which was to accuse her own client, Mr. Kniskern, of "self-dealing" and to accuse Mr. Kniskern's law firm, A&L, of incompetence. (*See* Liz Durkin's draft e-mails to Peter Ross, Peter Ross' e-mail to Residuaries, and Peter Ross' follow up e-mail to Residuaries after conference call attached hereto as Composite Exhibit "D").

60.     Liz Durkin never disclosed to Mr. Kniskern, her client, any of the inflammatory communications with Peter Ross and the Residuaries regarding the malicious accusations of self-dealing and incompetence, notwithstanding her fiduciary duties of loyalty and full-disclosure.

### F.   The GST Litigation

61.     At the same time that the Codicil Litigation had been commenced, the Estate learned of a second challenge to the poorly drafted Will prepared by the Durkin Firm, one which

could have led to the diversion of more than $80,000,000.00 away from the beloved charities, which Mr. Ross had premised his entire Estate on – the ultimate frustration of his testamentary intent.

62.    Mr. Ross' Will,  provided in part:

> I give **an amount equal to my then remaining Generation Skipping Tax Exemption**, in equal shares, to my grandchildren ("Grandchildren" or "Grandchild" shall mean only BARBARA'S and PETER's children) who survive me subject to the following restrictions. The interest created herein shall be held by my Trustees as separate trusts for the benefit of each such Grandchild in accordance with the following terms and conditions…

*See* Exhibit A (emphasis added).

63.    Mr. Ross' Will was signed and executed in August of 2009, at a time when it was known that commencing in 2010, the federal estate tax laws contained a provision that provided the elimination of the generation skipping tax entirely, and thus, could result in an <u>unlimited</u> generation skipping tax exemption instead of the pre-existing cap on the exemption in the amount of $5,000,000.00, less various prior credits of approximately $500,000.

64.    In essence, the Durkin Firm drafted the GST provision in such a way that rather than passing a *maximum* of $5,000,000 to his grandchildren (tax free), his entire residuary estate would instead pass to his grandchildren, leaving the Residuaries with nothing.

65.    Liz Durkin's failure to account for the changes in tax law and erroneously omitting a contingency provision to supplement the ambiguous GST provision, created an unavoidable dispute between the grandchildren and the Residuaries -- where all of the approximately $80,000,000.00 in residue would go to either the Residuaries or Mr. Ross' grandchildren.

112318505.1

66.     Ultimately, after substantial litigation between the Residuaries and the grandchildren over the GST provision, a global settlement agreement was reached by the parties and approved of by the probate Court on August 8, 2011, by which the Estate was required to pay $7,200,000.00 to the grandchildren, not including the costs of defense.

**G.  Durkin's Invoice and the Personal Representative's Fee Petition**

67.     During the negotiation process of a global settlement in the GST Litigation, Mr. Kniskern asked the Durkin Firm for the amount of its total accrued fees in order to determine approximately how much money would be left in the residue of the Estate after payment of professional compensation.

68.     However, despite multiple requests by Mr. Kniskern, the Durkin Firm would not provide any information as to its anticipated fee requests.

69.     In fact, while settlement negotiations were still ongoing in the GST Litigation, counsel for the Durkins demanded that the Estate hold back a large sum of money from distribution to the Residuaries to assure the Durkin Firm's compensation.

70.     On September 13, 2011, after weeks of prompting by Mr. Kniskern, the Durkin Firm submitted an invoice for legal services rendered for the ostensible benefit of the Estate in the amount of $1,410,469.91. (A true and correct copy of Durkin's Invoice is attached hereto as Exhibit "E").

71.     It was not coincidental that the Durkin Firm submitted a bill in an amount equal to the statutory personal representative fee of $1,400,000.00, which it had erroneously drafted itself out of.

72.     Upon review of the invoice, Mr. Kniskern concluded that the invoice contained a large number of unjustifiable, fabricated, and even fraudulent charges. Thereafter, he apprised

15

112318505.1

the Durkin Firm of his concerns, including substantial concerns as to the veracity of the billing entries, advised them that the Estate was not going to pay the invoice, and encouraged the Durkin Firm to file a petition with the probate court to obtain approval of their fees.

73.     In light of the Durkin Firm's failure to file a petition for approval of its fees, on or about October 11, 2011, Mr. Kniskern filed a petition on behalf of the Estate to have the probate court determine fair and reasonable attorneys' and accountant's fees. (A true and correct copy of Mr. Kniskern's Petition to Determine Fees of Durkin & Durkin, LLP is attached hereto as Exhibit "F").

74.     On January 17, 2012, the Durkin Firm filed an Amended Cross Claim alleging, *inter alia*, that A&L had breached an agreement with the Durkin Firm in which the Durkin Firm was to receive a flat fee between approximately $2,300,000.00 to $2,500,000.00 for the legal services the firm was to provide for the ostensible benefit of the Estate.

75.     Mr. Kniskern's petition and the Durkin Firm's cross claims became the subject of a seven-day trial to determine, *inter alia*, the Durkin Firm's professional compensation, which the parties called the "Phase I" trial.

76.     After the close of evidence during trial, the probate court granted A&L's *ore tenus* motion for involuntary dismissal of the Durkin Firm's claim for breach of contract against A&L for failure to offer any evidence at all to support the existence of any agreement.

**H.   Evidence of Durkin's Fabricated and Fraudulent Invoices**

77.     In the discovery phase, the Durkin Firm represented that it maintained no information of any kind that could independently confirm the time and narrative entries on its invoice. According to the Durkin Firm, all hand-written time sheets, notes, pre-bills and revisions were destroyed.

16

78.     In light of the serious concerns as to the authenticity of the Durkin Firm's bills, Mr. Kniskern moved the probate court for an order authorizing him to obtain an Audit Control Report of the Durkin Firm's timekeeping software (PCLaw[2]) to authenticate the invoice and verify that the billing entries were entered contemporaneously with the work allegedly performed.

79.     The probate court granted Mr. Kniskern's motion over the objection of the Durkin Firm.

80.     Notwithstanding the court's order, Durkin continued to stonewall Mr. Kniskern in his efforts, first by claiming that the firm's timekeeping software was not capable of creating such a report and, after conceding that a report could be produced, by providing only a limited report without all of the relevant information necessary to undertake a meaningful analysis.

81.     Eventually, under threat of sanctions against Durkin, Mr. Kniskern obtained a copy of the requested Audit Control Report the Friday before the Monday start of the Phase I trial, which conclusively showed that *at least* $390,157.41 of the Durkin Firm's time entries were fraudulent and fabricated out of whole cloth.

82.     The Audit Control Report established that hundreds of time entries were edited, both the narratives and the hours, in many cases months after the service was supposedly rendered to the Estate even though every scrap of independent corroborative evidence, i.e. time sheets, had been completely destroyed.

83.     As just one example of hundreds, the Durkin Firm's invoice contained a time entry by Liz Durkin, dated September 18, 2010, for 3.75 hours, which was edited on August 19,

---

[2] http://www.lexisnexis.com/law-firm-practice-management/pclaw/?content=for-customers

2011, to increase the time from 3.75 hours to 5.75 hours, where the only addition to the narrative was "Continue review of EFR's files."

84.     Indeed, some time entries were not even *entered* until August of 2011, for services that were purportedly rendered almost a year earlier, which would have been impossible given the destruction of all contemporaneous corroborating evidence

85.     For example, the invoice had an entry dated October 18, 2010, for two (2) hours of legal services allegedly rendered by Tom Durkin, which the Audit Control Report shows was not entered into the timekeeping system until August 23, 2011 -- the very same date printed on the invoice.

86.     Making matters even worse, the invoice contained $348,855.00 of legal services, at a rate of $650 per hour, despite the fact that according to Tom Durkin's own sworn deposition testimony, he "had nothing to do with" estate work at his firm.

87.     Yet another indicia of fraud is gleaned from the fact that Liz Durkin simultaneously submitted both the Durkin Firm's invoice **and** the Estate's accountant's invoice, without any explanation as to why the Durkin Firm would have in its possession, let alone submit, the accountant's invoice for accounting services.

88.     It was later revealed by the Estate's accountant, who had recanted his sworn testimony more than a year after the Phase I trial, and explained that the reason Liz Durkin had the accountant's invoice was because the two were simultaneously making revisions to their bills for weeks leading up to their final submissions, to both increase the amount of fees sought and ensure that the fraudulent entries for phantom meetings between the two were accurately reflected in both invoices without any apparent disparities that would expose their fraud.

## I.  The Aftermath

89.     After the Phase I trial, the presiding probate court judge issued a final order, in which he drastically reduced the Durkin Firm's requested fee from $1,410,469.19 to $447,637.50 and stated that the billing and timekeeping methods used by the Durkin Firm were not typical and their billing practice was exposed as "highly irregular and extremely faulty."

90.     Thereafter, Mr. Kniskern filed a motion seeking to tax the Estate's fees and costs on the Durkin Firm as a result of their bad faith misconduct relating to their billing practices. The probate court granted the motion, as to entitlement only, and stated,

> So I gave them fees, okay, that I thought were appropriate, but the manner in which the billing was handled, and the steps that the PR had to do to get to the truth of the billing, the manipulations on the computer systems, was highly improper by Durkin, and changes to the bills that they made after the fact was highly improper.

91.     At a subsequent hearing, the probate judge stated in open court that he thought what the Durkin Firm did (i.e. deliberately presenting a highly inaccurate bill and demanding to be paid that amount of money, without ever amending or withdrawing the bill once it became clear that many entries were indeed falsified) was "horrendous," and that he used the word "horrendous" rather than "fraud" only because he "tried to avoid bad words that can hurt people more than [he thinks] they should be hurt."

92.     The Defendants' drafting errors, egregious breaches of their fiduciary duties, efforts to defraud the Estate by way of destroying evidence, and fabricating time entries as well as falsifying testimony at trial to cover up the fraud, all resulted in significant harm to the Estate.

19

## COUNT I
## Breach of Fiduciary Duty
## (Mr. Kniskern v. Defendants)

93.     This is an action by Mr. Kniskern, as personal representative of the Estate of Eric
F. Ross, for breach of fiduciary duty against Durkin & Durkin, LLP, Liz Durkin and the Estate of
Thomas E. Durkin, Jr.

94.     Mr. Kniskern re-alleges and re-avers the allegations contained in paragraphs 1
through 60 and 67 through 92 as though fully set forth herein.

95.     As more fully described herein and at all times material hereto, an attorney client
relationship existed between Mr. Kniskern and Defendants, in which Mr. Kniskern reposed his
trust and confidence in Defendants and relied on them to act in the best interests of the Estate.

96.     More particularly, Defendants, as counsel for the Estate, owed Mr. Kniskern a
fiduciary duty of loyalty, good faith, and trust, which included, but was not limited to, a duty not
to engage in self-dealing or disloyal acts such as lying or submitting fabricated invoices for legal
services in order to misappropriate Estate assets.

97.     Liz Durkin breached her fiduciary duty to Mr. Kniskern by, among other things,
engaging in the following activities while serving within the scope of her capacity as counsel for
the Estate:

   a.   Failing to disclose to Mr. Ross her drafting error related to the appointment of
        unqualified personal representatives, and her subsequent efforts to "fix" the
        problem by self-servingly creating a trust vehicle, the purpose of which she
        hid from Mr. Ross, in order to still "earn" a personal representative fee rather
        than providing honest and competent legal advice.

20

b.  Conspiring with Peter Ross, behind Mr. Kniskern's back, to plan and execute a secret smear campaign to have Mr. Kniskern, her client, removed as personal representative for purported "self-dealing" and have A&L removed as counsel in retaliation for Mr. Kniskern's attempt to terminate the Durkin Firm as his counsel;

c.   Rendering invoices for legal services with actual knowledge that the time entries were highly inflated and even fabricated out of whole cloth in order to maximize a potential fee award in an effort to misappropriate Estate assets;

d.  Aiding and abetting the Estate's accountant in fabricating his invoice for accounting services in an effort to cover up the Durkin Firm's own billing fraud.

98.   Tom Durkin breached his fiduciary duty to Mr. Kniskern by, among other things, engaging in the following activities while serving within the scope of his capacity as counsel for the Estate

a.  Failing to disclose to Mr. Kniskern the critical material fact that he had entered Mr. Ross' New Jersey home after Mr. Ross' death, and then repeatedly lying about it to Mr. Kniskern when asked, at a time when serious accusations were being made that an executed Codicil existed and that someone had stolen it from Mr. Ross' house;

b.  Rendering invoices for legal services with actual and/or constructive knowledge that a substantial portion of the time entries were highly inflated and even fabricated out of whole cloth in order to maximize a potential fee award in an effort to misappropriate Estate assets.

21

99.     At all times material hereto, Liz Durkin and Tom Durkin were agents or employees of the Durkin Firm.

100.    As such, the Durkin Firm is vicariously liable for all acts of its agents, Liz Durkin and Tom Durkin, which fall within the scope of their employment.

101.    The provision of legal counsel and services, the acts of time keeping, and the preparation of an accurate invoice for payment of professional services all fall within the scope of Liz Durkin and Tom Durkin's employment with the Durkin Firm as attorneys.

102.    Therefore, the Durkin Firm is liable for Liz Durkin's and Tom Durkin's breaches of fiduciary duty committed in the course and scope of their agency and/or employment under the principle of *respondeat superior*.

103.    As a direct and proximate result of Liz Durkin and Tom Durkin's breaches of fiduciary duty, for which the Durkin Firm is liable, the Estate incurred damages including, but not limited to, unnecessary legal fees in order to defend the Estate from the Defendants' efforts to misappropriate Estate assets.

104.    As such, the Estate is entitled to recover damages proximately caused by Defendants' breaches of fiduciary duty in an amount to be determined at trial.

WHEREFORE, Plaintiff, Douglas Kniskern, as Personal Representative of the Estate of Eric F. Ross, demands that judgment be entered against Defendants, Durkin & Durkin, LLP, Liz Durkin and the Estate of Thomas E. Durkin, Jr., awarding damages in an amount to be fixed at trial, including an award of punitive damages, prejudgment interest and costs, and such other and further relief as the Court deems just and proper.

## COUNT II
### Professional Liability
### (Mr. Kniskern v. Defendants)

105.     This is an action by Mr. Kniskern, as Personal Representative of the Estate of Eric F. Ross, for legal malpractice against Defendants.

106.     Plaintiff re-alleges and re-avers the allegations contained in paragraphs 1 through 57 and paragraph 61 through 92 as though fully set forth herein.

107.     Liz Durkin had a duty to exercise that degree of honesty, reasonable care, knowledge, and skill ordinarily possessed and used by other trust and estate attorneys under similar circumstances.

108.     Liz Durkin was negligent and fell below the appropriate standard of care in her professional duties to Mr. Ross (and his Estate) by:

    a.   Failing to properly research the legal requirements necessary for one to qualify to serve as a personal representative of an estate under Florida law;

    b.   Failing to analyze Florida law and advise Mr. Ross that the candidates he selected to serve as his personal representative would not qualify under Florida law; and

    c.   Drafting a facially ambiguous generation skipping tax (GST) provision.

    d.   Rendering invoices for legal services with actual knowledge that the time entries were highly inflated and even fabricated out of whole cloth in order to maximize a potential fee award in an effort to misappropriate Estate assets; an

    e.   Aiding and abetting the Estate's accountant in fabricating his invoice for accounting services in an effort to cover up the Durkin Firm's own billing fraud.

109.    Tom Durkin had a duty to exercise that degree of honesty, reasonable care, knowledge, and skill ordinarily possessed and used by other trust and estate attorneys under similar circumstances.

110.    Tom Durkin was negligent and fell below the appropriate standard of care in his professional duties to Mr. Ross (and his Estate) by rendering invoices for legal services with actual and/or constructive knowledge that a substantial portion of the time entries were highly inflated and even fabricated out of whole cloth in order to maximize a potential fee award in an effort to misappropriate Estate assets.

111.    As a direct and proximate result of Liz and Tom Durkin's negligence, Mr. Ross' testamentary intent, as expressed in his Will, was frustrated.

112.    In addition, the Estate unnecessarily incurred substantial attorney's fees and costs relating to multiple pieces of litigation arising from the alleged Codicil that was prepared to remedy the unqualified personal representative issue as well as the construction of the ambiguous GST provision.

113.    Moreover, as a result of the GST ambiguity, the Estate was forced to settle the GST litigation at a cost of $7,200,000.

114.    And, the Estate incurred damages including, but not limited to, unnecessary legal fees in order to defend the Estate from the Defendants' efforts to misappropriate Estate assets.

115.    At all times material hereto, Liz Durkin and Tom Durkin were agents or employees of the Durkin Firm.

116.    The provision of legal counsel and services, the acts of time keeping, and the preparation of an accurate invoice for payment of professional services all fall within the scope of Liz Durkin and Tom Durkin's employment with the Durkin Firm as attorneys.

112318505.1

117.    As such, the Durkin Firm is also liable for Liz Durkin's and Tom Durkin's professional negligence committed in the course and scope of her agency and/or employment under the principle of *respondeat superior.*

WHEREFORE, Plaintiff, Douglas Kniskern, as Personal Representative of the Estate of Eric F. Ross, demands that judgment be entered against Defendants, Durkin & Durkin, LLP, Liz Durkin and the Estate of Thomas E. Durkin, Jr., awarding damages in an amount to be fixed at trial, including an award of punitive damages, attorneys' fees to the extent provided for by applicable law, prejudgment interest and costs, and such other and further relief as the Court deems just and proper.

## COUNT III
### Negligent Supervision
### (Mr. Kniskern v. Durkin & Durkin, LLP)

118.    This is an action by Mr. Kniskern, as Personal Representative of the Estate of Eric F. Ross, for negligent supervision against Durkin & Durkin, LLP.

119.    Mr. Kniskern re-alleges and re-avers the allegations contained in paragraphs 1 through 22, 39 through 45 and 67 through 92 as though fully set forth herein.

120.    At all times material hereto, Liz Durkin and Tom Durkin were agents or employees of the Durkin Firm.

121.    During the course of Liz Durkin's and Tm Durkin's employment, the Durkin Firm failed to properly monitor or otherwise ensure that invoices for legal services were truthful and accurate. Proper monitoring, investigation, and review of invoices for the firm's legal services would have revealed the false billings before the final invoice was ever rendered to the Estate for payment, and once the invoices were found to be false, the firm could have, and should have, undertaken efforts to correct the problem.

122.     Once the Durkin Firm had actual, constructive, or implied actual notice of the problems with Liz Durkin and her defective and fraudulent billing practices, it was unreasonable for the Durkin Firm not to properly monitor and correct her billing practices and to take further action to notify the Estate regarding same in order to mitigate any damages caused by such fraudulent billing.

123.     The Durkin Firm's breach of its duty to monitor or supervise its agents or employees, Liz Durkin and tom Durkin, was the direct and proximate cause of the damages incurred by the Estate including, but not limited to, unnecessary legal fees and costs incurred to defend the Estate from Liz Durkin's and Tom Durkin's efforts to misappropriate Estate assets by way of rendering a fabricated invoice for work that was never performed.

WHEREFORE, Plaintiff, Douglas Kniskern, as Personal Representative of the Estate of Eric F. Ross, demands judgment against Defendant, Durkin & Durkin, LLP, awarding damages in an amount to be fixed at trial, including punitive damages, prejudgment interest and costs, and such other and further relief as the Court deems just and proper.

<u>**COUNT IV**</u>
**Fraud**
**(Mr. Kniskern v. Durkin & Durkin, LLP and Liz Durkin)**

124.     This is an action by Mr. Kniskern, as Personal Representative of the Estate of Eric F. Ross, for fraud against Durkin & Durkin, LLP and Liz Durkin.

125.     Mr. Kniskern re-alleges and re-avers the allegations contained in paragraphs 1 through 22, 39 through 60 and 67 through 92 as though fully set forth herein.

126.     As detailed above, Liz Durkin made false statements to Mr. Kniskern in the Durkin Firm's invoice for legal services as to the nature and extent of legal services purportedly performed for the ostensible benefit of the Estate, all in an effort to misappropriate Estate assets.

127.    She further compounded the extent of the fraud by making knowingly false statements under oath, both in discovery and during trial, in support of her firm's claim for over $1,400,000 in legal fees.

128.    During trial, after counsel for the Estate exposed the fraudulent scheme by way of the Durkin Firm's timekeeping software's Audit Control Report, Liz Durkin constructively admitted to the falsity of approximately $400,000 of the time entries contained in the invoice.

129.    Liz Durkin knew that these statements and/or representations concerning the nature and extent of the work performed were patently false.

130.    Moreover, she brazenly conspired with the Estate's accountant to make sure that his invoice was edited in such a way as to match up with the Durkin Firm's fabricated invoice so as to evade detection.

131.    Liz Durkin fully intended that the false statements would induce Mr. Kniskern to act on them by paying the Durkin Firm's attorneys' fees in excess of those to which it was reasonably entitled.

132.    Mr. Kniskern relied on the fabricated invoice submitted by Liz Durkin and her false statements in connection with same. As a consequence, the Estate was injured by being required it to expend hundreds of thousands of dollars of Estate funds on legal fees to defend the Estate from Liz Durkin's fraud.

133.    Liz Durkin's actions were wanton and willful and in reckless disregard of the Estate's right to an honest and accurate bill from its attorney for legal services.

134.    At all times material hereto, Liz Durkin was an agent or employee of the Durkin Firm.

112318505.1

135.    The act of providing accurate and truthful billing for legal services falls squarely within the scope of Liz Durkin's employment with the Durkin Firm as an attorney.

136.    As such, the Durkin Firm is also liable for Liz Durkin's fraud committed in the course and scope of her agency and/or employment under the principle of *respondeat superior.*

WHEREFORE, Plaintiff, Douglas Kniskern, as Personal Representative of the Estate of Eric F. Ross, demands judgment against Durkin & Durkin, LLP and Liz Durkin, awarding damages in an amount to be fixed at trial, including punitive damages, prejudgment interest and costs, and such other and further relief as the Court deems just and proper.

## COUNT V
### Malicious Prosecution
### (A&L v. Durkin & Durkin, LLP)

137.    This is an action by A&L for malicious prosecution against Durkin & Durkin, LLP.

138.    A&L re-alleges and re-avers the allegations contained in paragraphs 1 through 22, 39 through 45 and 67 through 76 as though fully set forth herein.

139.    During the Phase I trial, the Durkin Firm commenced a cross-claim against A&L alleging that A&L had breached some fee agreement regarding a flat fee arrangement of approximately $2,500,000 for legal services to be rendered for the benefit of the Estate.

140.    The Durkin Firm commenced, continued and actively participated in the claim for breach of contract against A&L, as set forth in its Amended Cross Claim, even though the Durkin Firm knew that its Amended Cross Claim contained false allegations.

141.    A&L has obtained a bona fide termination of the Durkin Firm's claim in its favor as a result of the Durkin Firm's utter failure to produce any evidence of the so-called flat fee agreement.

28

142.    The Durkin Firm knew that there was no probable cause for commencing or continuing the claim against A&L for breach of contract, and had no good faith basis for doing the same.

143.    The Durkin Firm's conduct was predicated on improper motives including, but not limited to, the concealment of its own misconduct related to its fraudulent billing practices, and done with legal malice.

144.    As the direct and proximate cause of the wrongful actions of the Durkin Firm, A&L has been damaged.

WHEREFORE, Plaintiff, Arnstein & Lehr LLP, demands judgment against Defendant, Durkin & Durkin, LLP, awarding damages in amount to be fixed at trial, including, but not limited to the Wrongful Act Doctrine, punitive damages, prejudgment interest and costs, and such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, Douglas Kniskern, as Personal Representative of The Estate of Eric F. Ross and Arnstein & Lehr LLP demand trial by jury of all issues so triable.

Dated this 18th day of March 2015.

Respectfully submitted,

**ARNSTEIN & LEHR LLP**
*Counsel for Plaintiffs*
200 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, Florida  33301
Phone: (954) 713-7600
E-Mail: franklin.zemel@arnstein.com
          jbisrow@arnstein.com

By: /s/ Franklin L. Zemel
          Franklin L. Zemel
          Florida Bar No.: 816620
          Jordan B. Isrow
          Florida Bar No.: 92782